JOSEPH F. LENTZ, JR. ET AL. *v.*
PHILIP C. DYPSKY ET AL.

[No. 1105, September Term, 1980.]

*Decided June 5, 1981.*

The cause was argued before GILBERT, C. J., and THOMPSON and WILNER, JJ.

*William D. Hooper, Jr.,* with whom were *Donald C. Fry,* and *Lentz & Hooper, P.A.* on the brief, for appellants.

*Bruce C. Bereano,* with whom were *William H. Adkins, III* and *Henry, Hairston & Price* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

We know not what caused the bond of matrimony between Philip C. Dypsky and Evelyn C. Dypsky to be set asunder,[1] but we do know that the results of a partition proceeding reunited them, at least for the limited purpose of challenging a report of sale made to the Circuit Court for Worcester County by two trustees. Judge Edward O. Thomas agreed with the Dypskys that the report of sale should be set aside, and the chancellor passed an order to that end.

---

**1.** The parties were divorced in 1977 by a decree of the Circuit Court for Worcester County.

## — THE ISSUE —

Aggrieved at the circuit court's action, Joseph F. Lentz, Jr. and Victor Yanek, the purchasers of the properties,[2] have appealed. Appellants contend that:

> "The trial court erred when it set aside the judicial sale of land merely because of the relatively low price together with the parties' frustration when the evidence adduced at the trial indicated that the inadequacy of price, if any, did not shock the conscious [*sic*] of the court and did not result because of fraud, surprise, mistake or unfairness in the sale or because of misconduct, fraud or unfairness on the part of the trustee."

## — THE FACTS —

It is apparent from the record that this litigation stems from a 1977 decree of divorce *a vinculo matrimonii*.[3] Approximately 16 months after the divorce, Mrs. Dypsky filed a bill of complaint in the Worcester County Circuit Court in which she asserted that during her coverture she and Mr. Dypsky acquired certain real property located in that County. Mrs. Dypsky prayed that "a Decree ... be passed appointing Trustees (Counsel for both parties) ... to sell the aforementioned real estate, pay all existing liens [and] divide the proceeds..." after repaying an obligation allegedly due to Mrs. Dypsky.

Mr. Dypsky responded by way of an answer in March 1979. About a month later, the court signed a "Consent to Decree of Sale and Appointment of Trustees." The circuit court ordered, on April 18, 1979, that 1) "the ... properties be sold"; 2) two designated trustees "effectuate the sale"; 3) the trustees post a bond in the penalty amount of $25,000;

---

2. Originally there were three purchasers, but we were told at oral argument that one assigned her interest to Mr. Lentz.

3. Inasmuch as the record makes clear that following the 1977 divorce, the parties became tenants in common as to certain properties, we infer that the decree passed in 1977 was for a divorce *a vinculo matrimonii*.

and 4) the trustees hold the proceeds of the sale "pending a hearing on [Mrs. Dypsky's] claim for contributions in the amount of $8,778.22."

The Dypskys testified before Judge Thomas that each had made clear to his or her attorney the amount the property should bring at the sale. Mr. Dypsky said that he agreed to sell a motel property for $176,000, a Coastal Highway lot for $45,000, and lots in "Winchester" development for $30,000. The attorney for Mrs. Dypsky testified that his client had told him she would accept $168,000 to $175,000 for the motel, $30,000 for the Coastal Highway property, and $15,000 for the Winchester lots.

The advertisements concerning the sale carried the legend in bold type that:

> "THE UNDERSIGNED [TRUSTEES] RESERVE THE UNQUALIFIED RIGHT TO WITHDRAW THE PREMISES AT ANY TIME PRIOR TO OR DURING THE SALE."

While the advertisements were appearing in the various publications,[4] Mr. Dypsky's lawyer, who was also one of the trustees, "became very ill." Another attorney from the same law firm then commenced to represent Mr. Dypsky. That lawyer, Mr. Drake, said that Mr. Dypsky "was told in July and August . . . there were not going to be reservation sales." The attorney did not remember whether Mr. Dypsky responded that "he wanted reservations in the sale." Because the lawyer foresaw problems arising from the fact that "Mr. and Mrs. Dypsky . . . would probably not agree on anything . . . [including] the going price for a sale . . . and . . . a trustee could find himself in a position where one party wanted the thing sold and the other one didn't . . . ," he wrote to Judge Prettyman. In the letter it was asked:

> "1.  Do the Trustees have authority to remove the property from sale once the bidding . . . has begun?

---

4. The trustees reported that the properties were advertised in the *Salisbury Daily Times, Eastern Shore Times, Philadelphia Inquirer, Washington Post, Baltimore Sun, Baltimore News American, Wilmington News Journal,* and the *Richmond Times Dispatch.*

2. Can the Trustees, in concert and with full agreement of the respective parties involved, agree to remove a property from sale once the bidding has begun? . . ."

The judge responded in pertinent part by return mail:

"[I]t is my opinion that the Trustees have absolutely no authority to remove the property from sale once the bidding has begun.

. . . [I]t is my opinion that the Trustees, even in concert with, and in view of the full agreement of, the respective parties, have absolutely no authority to remove the property from sale once the bidding has begun."

Mr. Dypsky went to the sale, and before it commenced, he announced that he objected to the sale's being made without reservation. He said, "It's been advertised that at any time the Trustees can stop the sale, according to the ads. . . . As part owner of this property, I'm going to contest this." Substantially the same statement was made by Mr. Dypsky before each property was "knocked-down." [5]

The Trustees filed their "Report of Sale" in September 1979, and Mr. Dypsky promptly excepted.

Judge Thomas noted that Judge Prettyman's "opinion, . . . when ultimately relayed to the . . . [Dypskys], somehow attained the stature of a court order." Patently, it was not. It was no more than Judge Prettyman's "opinion" which, Judge Thomas observed, should have operated as a triggering device to cause the attorneys for the Dypskys to seek an amendment to the partition decree.

The only expert testimony at the trial suggested that the prices brought at the sale were ranged from approximately 45% to 60% of the appraised value. Judge Thomas opined that:

---

5. There were three bidders on the Coastal Highway property. The high bid was $16,750. The Winchester lots "located behind the Nichi-Bei-Kai" off U.S. Route 50, brought $6,100. There were "12 to 15 people in attendance." No record was apparently made as to the number of bids. The high bid for the motel was $76,000. There were two bidders and two bids, one for $75,000 and the other for $76,000.

"Whether ... this is low enough to 'shock the conscience of the Court,' can not be considered alone. Certainly, the relatively low price together with the frustration of the parties ... [in the sale's being made without reservation] because they had no control over the prices for which the property would be sold would be sufficient, in the Court's mind, to sustain the exceptions."

— *THE LAW* —

The authority of Maryland courts of equity to exercise jurisdiction over partition proceedings stems from 31 Henry VIII, ch. 1 (1590). That parliamentary statute remained an integral part of the Common Law of Maryland following the War of Independence waged between the colonies and the British crown. Maryland Declaration of Rights, Article 5. Subsequently, the General Assembly enacted a partition statute by Laws 1785, ch. 72, § 12. The statute has been amended from time to time.[6] The current version is found in Md. Real Property Code Ann. § 14-107.[7]

Real Property Art. § 14-107 (a) provides in pertinent part:

"*Decree of partition.* — A circuit court may decree a partition of any property, either legal or equitable, on the bill or petition if any ... tenant in common . . . whether claiming by descent or purchase. If it appears that the property cannot be divided without loss or injury to the parties interested, the court may decree its sale and divide the money resulting from the sale among the parties according to their respective rights. . . ."

6. *See* 1831 Md. Laws, ch. 311, §§ 1, 9; Md. Ann. Code art. 16, § 99 (1860); Md. Ann. Code art. 21, § 14-107 (1972 Supp.); 1974 Md. Laws, ch. 12, § 2.

7. To assure that the statute of 31 Henry VIII, ch. 1 was no longer viable in this State, the Legislature, by Md. Real Property Code Ann. § 14-115, expressly declared that British statute to be "no longer in force and effect in the State."

As we read the statute, the purpose of the court's ordering a sale is to minimize "loss or injury to the parties." Thus, a public sale, without reservation of the right to withdraw the property from the sale, either before, during, or after the sale, but before ratification, defeats the purpose of the statute. The injury prevented by the exercise of the right to order a sale could be inflicted by a public sale without reservation as implied by the Court of Appeals in *Gray v. Veirs,* 33 Md. 18 (1870), where an attack on a trustee's refusal to accept a bid was rejected. The Court said:

> "The trustee is not bound to accept every bid. He is necessarily clothed with a prudent and sound discretion, and the court will always sustain him in refusing bids which would manifestly defeat and frustrate the very object and purpose of a sale." *Id.* at 22.

*See also Whitely v. Whitely,* 117 Md. 538, 84 A. 68 (1912); *Gibbs v. Cunningham,* 1 Md. Ch. 44 (1847).

As a general rule, a trustee's sale is not normally set aside because of inadequacy of the sales price. An exception to that rule occurs when the price is so grossly insufficient as to shock the conscience of the Court. *Suburban Garden Farm Homes Corp. v. Duckett,* 179 Md. 648, 22 A.2d 467 (1941); *Johnson v. Dorsey,* 7 Gill 269 (1848); *Garland v. Hill,* 28 Md. App. 622, 346 A.2d 711 (1975), *aff'd,* 277 Md. 710, 357 A.2d 374 (1976).

There are, however, other reasons for voiding a sale besides gross inadequacy of price. Misconduct, fraud, or unfairness on the part of the trustees may also result in the sale's being invalidated. *Vollum v. Beall,* 117 Md. 617, 620, 83 A. 1095, 1096 (1912).

The instant case contains no evidence that would lead to a rational conclusion of fraud or misconduct by the trustees. Nevertheless, their mistaken belief that they lacked the necessary powers to offer the property for sale, subject to the reservation of the right to reject any and all bids amounts, in this case, to unfairness to the Dypskys. The trustees knew

the prices that were acceptable to the Dypskys, yet they sold the properties for an aggregate sum far below the acceptable minimum.

It may be argued that Mr. Dypsky's conduct at the sales, together with his vocalized threat to sue so as to vitiate the matter, discouraged prospective bidders. Even if that argument be true, the fact remains that the trustees did not "offer the property in such a manner as to bring its fair market value, and to exercise the same judgment and prudence that a careful owner would exercise in the sale of his own property." *Hopper v. Hopper,* 79 Md. 400, 402, 29 A. 611, 612 (1894).

Recently, in *McCartney v. Frost,* 282 Md. 631, 638, 386 A.2d 784, 788 (1978), *rev'g,* 37 Md. App. 495, 378 A.2d 170 (1977), Judge Smith, for the Court of Appeals, quoted with approval the case of *Home Owners' Loan Corp. v. Braxtan,* 220 Ind. 587, 592, 44 N.E.2d 989, 991 (1942). There the Indiana Court said: "The purpose of the sale is not to afford some stranger an opportunity to make off with the property . . . to his own great advantage and to the great disadvantage of either the judgment defendant or the judgment creditor."

Although the Court of Appeals, in *McCartney,* was concerned with a sale by a sheriff pursuant to a writ of *fieri facias,* while we are confronted by a challenged trustees' sale, the rationale remains the same.

The powers conferred upon the trustees to sell are not without bounds. A court order authorizing a sale by a trustee is not a license to dispose of the property without regard to its true value so as to allow a stranger to reap a harvest to the detriment of the owners. This does not mean, however, that the owners reserve the right to control the sale through mechanization of the trustees because trustees are not mere puppets of the owners. Rather, they are officers of the court, and as such, are under a duty to the court and to the owner to obtain the best possible price, under the circumstances, and, if necessary, to withdraw the property from the sale.

A partition sale is not the same as a foreclosure or sheriff's sale. The conduct of the trustees or the sheriff, in the latter,

may differ substantially from a partition sale, particularly when, as here, the owners desire the sale and have expressed to the trustees what they believe to be a proper valuation of the property and have insisted that the property be offered for sale, subject to the reservation of the right to reject any and all bids.

The erroneous belief by the trustees in the instant case that the property could not be offered at an auction sale subject to the reservation of rights, when coupled with bids at sale of approximately fifty percent of value of properties, constitutes sufficient cause for the chancellor to nullify the sale. Thus, we hold that Judge Thomas properly revoked the trustees' sale to the appellants.

*Order affirmed.*
*Costs to be paid by appellants.*